

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.                    )

<u>ANTHONY HERNANDEZ,</u> B77118          )
(Full name and prison number)                       )
(Include name under which convicted)                )
                                                    )
PETITIONER                                          )

                                                    )    13 C 3394
                                                    )    Judge Robert W. Gettleman
                                                    )    Magistrate Judge Sidney I. Schenkier
        vs.                                         )

<u>RICHARD HARRINGTON</u>                     )
(Warden, Superintendent, or authorized             )
person having custody of petitioner)               )
                                                    )          **FILED**
RESPONDENT, and                                     )
                                                    )    MAY 0 6 2013
**(Fill in the following blank <u>only</u> if judgment**  )
**attacked imposes a sentence to commence**         )    THOMAS G. BRUTON
**in the future)**                                  )    CLERK, U S. DISTRICT COURT
                                                    )
ATTORNEY GENERAL OF THE STATE OF                    )    Case Number of State Court Conviction:
                                                    )
_____                     )    <u>01 CR 13645</u>
(State where judgment entered)                      )

### PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered: <u>Circuit Court of Cook County,</u>
    <u>2650 S. California, Chicago, Illinois 60608</u>

2.  Date of judgment of conviction: <u>September 16, 2004</u>

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
    <u>First Degree Murder, Attempt Murder, and Unlawful use of a weapon by a felon.</u>

4.  Sentence(s) imposed: <u>55 years (Murder), consecutive 10 years (Attempt (Cont. Pg 8)</u>

5.  What was your plea?  (Check one)        (A)  Not guilty        ( ✓ )
                                            (B)  Guilty            (   )
                                            (C)  Nolo contendere   (   )

    If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

    <u>N/A</u>

                                                    Revised:  7/20/05

## PART I – TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):  Jury ( )  Judge only (✓)

2. Did you testify at trial?  YES ( )  NO  (✓)

3. Did you appeal from the conviction or the sentence imposed? YES (✓) NO ( )

   (A) If you appealed, give the

     (1) Name of court:  Appellate Court of Illinois

     (2) Result:  Conviction and Sentence's Affirmed (No. 1-04-3368)

     (3) Date of ruling:  November 15, 2006.

     (4) Issues raised:  Petitioner was denied effective assistance of counsel where trial counsel failed to confront a key State witness with his prior inconsistant statement (Continued on Page 3.)

   (B) If you did not appeal, explain briefly why not:

     N/A

4. Did you appeal, or seek leave to appeal, to the highest state court? YES (✓)  NO ( )

   (A) If yes, give the

     (1) Result:  Petition For Leave To Appeal Denied (No. 103962)

     (2) Date of ruling:  March 25, 2007

     (3) Issues raised:  Appellate Court erroneously concluded that trial counsel did not render ineffective assistance in a situation where counsel failed to make use of an occurrence witness statement (cont. Pg. 8)

   (B) If no, why not:  N/A

5. Did you petition the United States Supreme Court for a writ of *certiorari*? Yes ( ) No (✓)

   If yes, give (A) date of petition:  N/A  (B) date *certiorari* was denied:  N/A

2

Revised: 7/20/05

Mar 9, 2012    11:27 AM

## PART II – COLLATERAL PROCEEDINGS

1.  With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

    YES (✓)   NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A.  Name of court: Circuit Court of Cook County, Illinois

    B.  Date of filing: August 17, 2010.

    C.  Issues raised: ① Petitioner is Actually Innocent of the crimes for which he was convicted as demonstrated by new evidence that shows counsel was ineffective; ② Counsel was ineffective (Cont. Pg. 8)

    D.  Did you receive an evidentiary hearing on your petition?   YES ( )  NO (✓)

    E.  What was the court's ruling?  Petition Denied (Deemed Successive Pleading)

    F.  Date of court's ruling: October 19, 2010.

    G.  Did you appeal from the ruling on your petition?   YES (✓)  NO ( )

    H.  (a)   If yes, (1) what was the result?  Denial of Petition Affirmed

        (2) date of decision:  August 30, 2012

        (b)   If no, explain briefly why not:  N/A

    I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

        YES (✓)  NO ( )

        (a)   If yes, (1) what was the result?  PLA Denied (No. 115127)

            (2) date of decision:  January 30, 2013.

        (b)   If no, explain briefly why not:  N/A

Revised: 7/20/05

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES (✓)    NO ( )

A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

1.   Nature of proceeding    2-1401 Petition for Relief from Judgment

2.   Date petition filed    September 1, 2009.

3.   Ruling on the petition    Court recharacterized pleading (cont. Pg. 8)

4.   Date of ruling    _____

5.   If you appealed, what was the ruling on appeal?    N/A

6.   Date of ruling on appeal    N/A

7.   If there was a further appeal, what was the ruling ?    N/A

8.   Date of ruling on appeal    N/A

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )    NO (✓)

A. If yes, give name of court, case title and case number:  N/A _____

_____

B. Did the court rule on your petition?  If so, state

(1) Ruling:   N/A _____

(2) Date:   N/A _____

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?    YES ( )    NO (✓)

If yes, explain:   N/A _____

_____

4

Revised:  7/20/05

## PART III – PETITIONER'S CLAIMS

1. State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one Petitioner was deprived of his constitutional right to the
Supporting facts (tell your story briefly without citing cases or law):

effective assistance of counsel which rendered his trial fundamentally unfair in violation of the 6th and 14th Amendment's of the United States Constitution, where trial counsel failed to confront a key State witness (Omar Rodriguez) with his prior inconsistent statement in which he admitted that he himself shot the victim and where the statement could've been used to impeach Rodriguez trial testimony as well as his videotaped statement and where the statement was (Continued Page 8)

(B) Ground two Petitioner was deprived of his constitutional right to the
Supporting facts:

effective assistance of counsel which rendered his trial fundamentally unfair in violation of the 6th and 14th Amendments of the United States Constitution, where trial counsel failed to call Petitioner's alibi / exculpatory witness (Cassandra Rivera) to testify at trial in support of his actual innocence. (EVIDENTIARY HEARING REQUESTED)

(Supporting facts continued on Page 15)

5

Revised: 7/20/05

(C) Ground three _Petitioner was deprived of his constitutional right to_
Supporting facts:

_the effective assistance of appellate counsel in violation of the 6th_
_and 14th Amendments of the United States Constitution, where_
_appellate counsel failed to raise the claim on direct appeal that_
_trial counsel rendered ineffective assistance by failing to interview_
_and call Cassandra Rivers to testify at Petitioner's trial in support_
_of his innocence. (EVIDENTIARY HEARING REQUESTED)_
_(Supporting facts continued on Page 19.)_

(D) Ground four _____
Supporting facts:

_____
_____
_____
_____
_____
_____
_____
_____

2. Have all grounds raised in this petition been presented to the highest court having jurisdiction?

   YES ( ✓ )   NO (  )

3. If you answered **"NO"** to question (2), state <u>briefly</u> what grounds were not so presented and why not:

_____
_____N/A_____

Revised: 7/20/05

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing  Michael D. Krejci          Krejci represented this

(B) At arraignment and plea  1770 Park St.          Petitioner during each

(C) At trial          Naperville, Ill 60863          stage here Marked as

(D) At sentencing          Suite # 205          (A), (B), (C), and (D)

(E) On appeal  Frank Cece, 53 W. Jackson - STE.1650, Chicago, Illinois 60604

(F) In any post-conviction proceeding  N/A

(G) Other (state):  Petitioner was otherwise represented by office of the state
Appellate Defender on appeal for all other herein mentioned proceedings.

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )  NO (✓)

Name and location of the court which imposed the sentence:  N/A

Date and length of sentence to be served in the future          N/A

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on:  03.18.2013
(Date)

N/A
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_Anthony Hernandez_
(Signature of petitioner)

B77118
(I.D. Number)

PO BOX 1000, MENARD, IL. 62259
(Address)

Revised: 7/20/05

(Continued from Page 1.)

4. Sentence(s) imposed: Murder), and concurrent 5 years (Unlawful use of a weapon by a felon).

(Continued from Page 2.)

PART 1 - TRIAL AND DIRECT REVIEW CONTINUED

(1)(A)(4) Issues raised: that he himself shot the victim.

(Continued from Page 2.)

PART 1 - TRIAL AND DIRECT REVIEW CONTINUED

(4)(A)(3) Issues raised: which exonerated the Petitioner as the person who shot the decedent.

(Continued from Page 3.)

PART II - COLLATERAL PROCEEDINGS CONTINUED

(1)(C) Issues raised: where he failed to call Petitioner's alibi witness, Cassandra Rivera, to testify in support of his innocence, and ③ that Appellate Counsel was ineffective for failing to raise the above claims on Direct Appeal.

(Continued from Page 4.)

PART II - COLLATERAL PROCEEDINGS CONTINUED

(2)(A)(3) Ruling on the Petition: as a Postconviction Petition without Notice to the Petitioner and Summarily Dismissed the Petition.

(Continued from Page 5.)

PART III - PETITIONER'S CLAIMS CONTINUED

(1)(A) Ground One: admissible as substantive evidence that Rodriguez

8.

was the shooter. (EVIDENTIARY HEARING REQUESTED)

1.    Defense counsel in the case at bar failed to properly cross-examine, confront, and therein impeach one of the state's primary witnesses, Omar Rodriguez, with his prior inconsistant statement in which he admitted that he himself shot and killed the victim and further failed to introduce said prior inconsistant statement into evidence as substantive evidence that Rodriguez was the shooter as well as proof that the Petitioner was innocent.

2.    On or about the date of June 28, 2000, during early morning hours, Joey Arroyo was shot and killed after a collision involving three cars. One of which Arroyo was a passenger.

3.    Later, on the date of said shooting, Roberto Gomez and Omar Rodriguez were both arrested and interrogated in relation to Arroyo's murder. Both Gomez and Rodriguez ultimately made video-taped statements regarding said shooting. On the same date, a third person was taken into police custody in relation to said shooting. That person was Richard Cardenas. Cardenas gave a written statement a couple days later. All three men were members of the Spanish Cobra street gang and in their herein mentioned video-taped and/or written statement's, all three men implicated the Petitioner either directly or circumstantially as the person who killed Arroyo.

4.    The Petitioner was later taken into police custody during March of 2001, arrested on a warrant and ultimately charged with

9.

a host of offenses arising from events involving Arroyo's death. Those charges being first degree murder, attempt murder, and unlawful use of a weapon by a felon. Of said charges the Petitioner maintained a plea of not guilty.

5.    During September of 2003, Petitioner's bench trial was had and although the evidence presented by the prosecution was heavily conflicting, the following facts are undisputed and necessary for the purpose allowing Petitioner's claim to be properly understood.

On the night of the shooting, Arroyo was hanging out at a park with a group of friends/associates. Those being Steven Huff, Louis Tirado, Glenn Martin, Malysa Korner, and Tracy Jaworski. At around 2:00 a.m., Korner and Arroyo walked with Martin and Jaworski to a gas station at Bryn Mawr and Kedzie to use the bathroom. On their way back to the park, Stein and Rodriguez had pulled up in a Camery and claimed they were members of the Royals street gang. That being the gang that Arroyo was a member of. Because Stein and Rodriguez lied to Arroyo about being Royals, they were invited back to the park to socialize. After a while, Stein and Rodriguez later left the park.

After Stein and Rodriguez left the park in the Camery, Arroyo and his friends piled into Tirado's car, a Buick, and left the park themselves but left Martin behind. Tirado drove, Arroyo and Korner were passengers in the front seat, and Huff and Jaworski were in the back seat. Tirado initially drove towards Bryn Mawr before he turned back to pick up Martin. When Martin was found on a side

10.

street, Martin said he had just been shot at and pointed out the Camery Stein and Rodriguez were in earlier which was being driven just ahead of Tirado's car. Armed with that information, Tirado sped up and followed the Camery before ultimately ramming his car into it. Immediately after his car crashed into the Camery, another car crashed into Tirado's Buick. Once Tirado's car stopped moving, it is clear that the scene had become chaotic and shots were fired that left Arroyo dead inside Tirado's car and left Korner with a bullet graze wound in her back.

6.        With the identity of the actual shooter uncertain, the state presented the following evidence, in relevant part, through testimony of a number of witnesses.

At the outset, Richard Cardenas, Omar Rodriguez, and Roberto Gomez were all called as witnesses to testify on behalf of the state. What each witness had in common was they were each charged in connection with Arroyo's murder, they were each members of the Spanish Cobra street gang, and they each entered into plea deal's prior to Petitioner's trial in relation to Arroyo's death. Rodriguez was the first to plead guilty to first degree murder in exchange for 22 years during June of 2002. Gomez plead guilty three month's later to first degree murder and attempt murder in exchange for the same 22 years. Cardenas charges were reduced from first degree murder to con-spiracy to commit murder and, in October of 2002, he plead guilty in exchange for 6 1/2 years.

CARDENAS testified that on the date of the shooting he saw

11.

Rodriguez in a Camery and Gomez, along with the Petitioner and his girlfriend, in a station wagon. Cardenas claimed that he and the two vehicle's turned onto a side street when he heard two shots but could not tell where they came from. Cardenas exited his car before a car crashed into the station wagon and then hit him. He then approached the car that hit him, reached in the driver's window, and tried to pull the driver out. Cardenas heard a shot behind him but when he turned around no one was there. Cardenas admitted that he'd told detective's what happened in a written statement but further stated that said statement included lies that he was coerced into saying by the police who forced him to implicate the petitioner as the potential shooter. Said coerced statement was introduced by the State and it alleged that Cardenas saw the Petitioner with a gun in his hand after he heard shots.


GOMEZ testified that on the night of the shooting he passed a guy standing by some parked cars and heard gunshots but noticed that Rodriguez had a gun when he passed the car Arroyo was in. He pulled over and told Rodriguez to get out because he was armed when the car that Arroyo was in had appeared from nowhere and crashed into his car. Gomez then saw Rodriguez approach the car and fire a shot into it. He further testified that he was physically abused by the police when he was taken into custody and that his fiancee was brought into the interrogation room for him to see before the police threatened to lock her up and take their kids unless he changed his story and claim that the Petitioner was the actual shooter. Gomez admitted that he re-hearsed his statement with the police before then making a videotaped version of it with the assistant state's attorney which implicated the

12.

Petitioner as Arroyo's killer. Gomez testified that despite the content of the coerced videotaped statement, the Petitioner was not the person who shot and killed Arroyo.

RODRIGUEZ testified that he met with fellow gangmembers at Jenson park and told them where they could find some Royals before the group entered cars and drove to the area. Rodriguez and Stein drove in the Camery and ultimately found the Royals when he heard two gunshots. After the collision he ran to Gill's car but heard a gunshot from behind while doing so but did not see who fired the shot. However, the state used his videotaped statement to impeach his testimony. Said statement alleged that after the car crash, he witnessed the Petitioner approach the Royals car with a gun but only heard gunshots and didn't see the actual shooting. Yet Rodriguez disavowed the videotaped statement and testified that he was threatened and physically abused by detective's who coerced him into suggesting that the Petitioner was the shooter.

7.      The Prosecution also introduced the testimony of Brian Stein and Louis Tirado involving the issue of identification. Stein claimed that he and Jason Piurkowski rode in the Camery driven by Rodriguez. He claimed that after the collision he saw Cardenas attempting to pull the Royals out of the car when the Petitioner approached the drivers side of the car, stuck his arm through the window, and there was two flashes of light and two gunshots. Yet he did not attest that the Petitioner carried a gun or that he actually saw the Petitioner shoot anyone. Despite his apparent involvement, Stein was neither charged nor tried. In relevant part, Tirado testified that after the crash he saw a man approaching the car with a gun in his hand.

13.

Tirado recognized the gunman as one of the guys who was in the Camery at the park earlier. Tirado later identified the driver of the Camery but claimed he was not the shooter, yet he was confronted with a picture of the Petitioner in August of 2000 and identified him as the person he saw with a gun. While Tirado denied telling Detective Jacobs that the photo of the Petitioner was the same as the one he'd seen in the Neighborhood on a flier, Jacobs testified to the contrary and Jacobs report revealed the same.

8.    Prior to Petitioner's trial, defense counsel obtained an affidavit from Omar Rodriguez. In summary, Rodriguez admits that he fired the shot into the car that resulted in Arroyo's death. He also claimed that the police promised him that he'd be released if he would blame the Petitioner as the actual shooter. Once he'd implicated the Petitioner as he was told to — instead of being released as promised — Rodriguez was charged with Arroyo's Murder and sent to the Cook County Jail. Most importantly, Rodriguez clearly averred that the Petitioner is innocent.

9.    Given the Nature of the facts presented by the prosecution as well as the facts contained in Rodriguez' affidavit (attached hereto as Exhibit - A), that was in defense counsel's posession at the time of Petitioner's trial, counsel's failure to use said affidavit to cross examine Rodriguez for the purpose of impeaching his offered testimony, failure to introduce said affidavit into evidence as a prior inconsistent state-ment in which he admitted being the shooter while absolving the Petitioner, and his failure to introduce said statement/affidavit as substantive evidence that Rodriguez was the shooter and proof that the Petitioner was innocent amounted to deficient performance that

14.

fell well below an objective standard of reasonableness under prevailing professional norms.

10.     Petitioner further assert that he was prejudiced by counsel's deficient performance, especially since the identity of the actual shooter was the primary and pivotal issue at the Petitioner's trial. Had counsel used Rodriguez affidavit during cross-examination then counsel could have impeached both Rodriguez' trial testimony and his videotaped statement that had been admitted as substantive evidence by the prosecution. Counsel could've also offered the affidavit as substantive evidence that Rodriguez was the shooter which would've also corroborated Gomez testimony that Rodriguez was the shooter. In the same breath, the trial court ruled that Rodriguez' videotaped statement, along with the prior statements of Gomez and Cardenas was the most compelling evidence in the case. Given the fact that Gomez and Cardenas had both testified that they'd been coerced through mental and physical abuse to make their prior statements, that Rodriguez testified that the police promised they'd let him go if he lied and accused the Petitioner of being the shooter, and since the police threatened Rodriguez that he would go down for murder if he didn't implicate the Petitioner, the videotaped statement was arguably more reliable than the prior statements of Gomez and Cardenas and thus there exist's a reasonable probability that, had it not been for counsel's failure, the outcome of the Petitioner's trial would've likely been different.

(Continued from Page 5.)

11.     Defense counsel in the case at bar failed to conduct a complete

investigation, failed to properly interview readily available witnesses, and ultimately failed to call Petitioner's alibi/exculpatory witness, Cassandra Rivera, to trial to testify in support of Petitioner's innocence.

12.     Petitioner reassert, reallege, and incorperate any and all facts, allegations, and exhibit's along with any and all reasonable inference's to be drawn therefrom as it'll relate to all of the above that's been stated herein as Ground One. Petitioner therein state that such should all be considered as a portion of what will be presented below in relation to Ground Two.

13.     Prior to trial, the Petitioner consulted with defense counsel on a number of occassion's for the purpose of discussing his case. The Petitioner also had a number of conversation's with counsel for the purpose of preparing for trial. It was during these herein stated conversation's that the Petitioner explained to counsel that he was not the person who shot and killed Arroyo, that he had not got into the vehicle with his girlfriend with any knowledge that a fued would ensue, that he was unaware that any of his friends were armed, and that his girlfriend had accompanied him on the night of the incident and she could attest to his innocence. The Petitioner provided counsel with his girlfriend's name, address, and phone number so that he could contact her for an interview. See Exhibit D - Affidavit of Anthony Hernandez.

14.     The Petitioner learned over time that counsel had not contacted Petitioner's girlfriend, Cassandra Rivera, for the purpose of conducting an interview and gaining the information known to her about the events surrounding Arroyo's death. Because the Petitioner felt that counsel

16.

was ignoring his repeated requests and/or directions to interview Rivera, the Petitioner voiced his dismay to his mother, Linda Hernandez. As a result of said complaints, Linda Hernandez began to notify defense counsel that Cassandra Rivera was a witness to the events surrounding Arroyo's murder and that Rivera was in the Petitioner's presence. Rivera was skeptical but willing to testify and such was relayed to counsel by Linda Hernandez when she'd also informed counsel that the Petitioner wanted Rivera called as his witness, wanted counsel to interview her, and when she'd provided trial counsel with Rivera's contact information. Linda Hernandez learned that counsel still made no effort and had not contacted and/or interviewed Rivera at no point prior to Petitioner's trial. See Exhibit B attached hereto — Affidavit of Linda Hernandez.

15.   Had trial counsel properly investigated, interviewed Rivera, and thereinafter called her to testify at Petitioner's trial then counsel would have learned and Rivera would have testified that Rivera was with the Petitioner during the night of Arroyo's shooting. According to the affidavit of Rivera, she and the Petitioner were waiting for someone to pick them up at the corner of Lawndale and Lawrence after having spent the day together. Around midnight, Roberto Gomez pulled up in a grey station wagon, and she and the Petitioner got in the back seat. While Gomez was in the process of driving them to Petitioner's home, a red car began flashing lights behind them. Gomez pulled over and spoke with the driver, Omar Rodriguez. Brian Stein and another guy was in the car. After speaking with Rodriguez, Gomez returned to the station wagon with a man out of the other car who got into the front passenger seat. Gomez told the Petitioner and Rivera that he was gonna follow the car driven by Rodriguez because it was stolen and they wanted to

prevent the police from driving behind it.

The new passenger in the car waved the car to move in front of the station wagon but another car stopped them and the people from both cars spoke and decided that the dark red car would follow the station wagon. When the driver of the small red car turned down a side street, Gomez thought that its driver, Gomez, was lost. Gomez and the car behind him both began flashing their lights to gain Rodriguez attention but he continued driving. Because Rodriguez seemed to ignor them, the Petitioner directed Gomez to take him and Rivera home.

Rodriguez stopped less than a block ahead and when Gomez pulled behind it, Rivera saw people pointing at the car following them when she heard the Petitioner tell her to get down, then heard a loud pop. When Rivera looked up, she saw the person in the front seat put his arm out the window before hearing two more pops. The Petitioner began to yell at Gomez while Gomez yelled at the guy in the front passenger seat. Someone yelled from the dark red car that they'd been shot and Rivera saw a man with blood on his hands and shirt. The Petitioner had again directed Gomez to drive away but he couldn't because a car had slammed into them so the Petitioner then directed Rivera to get out of the car with him, and the Petitioner and Rivera then walked to Ridgeway and Lawrence, where they both took a cab to Petitioner's house. Both the Petitioner and Rivera remained at Petitioner's home for the rest of the night. The next morning Rivera learned that several people were hurt and that someone had died.

Most importantly, Rivera's affidavit made it clear that the Petitioner was unarmed and that he had not shot or killed anyone. See Exhibit C attached hereto - Affidavit of Cassandra Rivera.

-18-

16.      Given the information known to counsel prior to Petitioner's trial as was provided him by the prosecution through the discovery process, the information provided to him by the Petitioner, and the information that was provided him by Petitioner's mother as is presented in the attached Exhibit's B and D, counsel's failure to conduct a complete investigation, properly interview Cassandra Rivera, and call Rivera to testify at trial to the facts stated in her attached affidavit (Exhibit C) amounted to deficient performance that fell well below an objective standard of reasonableness under prevailing professional norms.

17.      Petitioner further assert that he was prejudiced by trial counsel's deficient performance since the testimony of Rivera would've been exculpatory in nature and would've offered the presiding judge with evidence of Petitioner's innocence in the face of the conflicting testimony offered by the Prosecution. Had it not been for counsel's deficient performance, there exist's a reasonable probability that the outcome of his trial would've been different.

(Continued from Page 6.)

18.      Appellate counsel in the case at bar failed to raise the readily available and meritorious issue on direct appeal that the Petitioner's trial counsel was ineffective for failing to interview and ultimately call Petitioner's lady friend, Cassandra Rivera, to the stand to testify on the Petitioner's behalf given the fact that her testimony would've been exculpatory in nature.

19.      Petitioner reassert, reallege, and incorporate any and all

facts, allegations, and exhibits along with any and all reasonable inferences to be drawn therefrom as it'll relate to all of the above that's been stated herein as GROUND ONE and TWO. Petitioner therein state that such should also all be considered as a portion of what will be presented below in relation to GROUND THREE.

20.     A review of the record on appeal, as it would relate to the Petitioner's direct appeal, revealed, inter alia, that the Petitioner was prosecuted by way of a bench trial, that the Prosecution presented the testimony of seven occurrence witnesses with respect to identification (i.e. Brian Stein, Roberto Gomez, Richard Cardenes, Louis Tirado, Omar Rodriguez, Malysa Korner, and Glen Martin.), that three of the States witnesses were charged in connection with Arroyo's death and each had also entered negotiated pleas of guilt (Cardenas, Rodriguez, and Gomez), that Cardenas and Rodriguez testified at trial that they didn't see who shot Arroyo while Gomez testified that Rodriguez was the shooter, that Korner and Tirado, the two witnesses who were in the front seat with Arroyo, were hunched down in the car when the shots were fired, and that Stein was the single witness to claim he saw Petitioner shoot the victim. Additionally, the record revealed that he was with fellow gang members (allegedly Cardenes, Rodriguez, Gomez, and the Petitioner) at the time of the shooting but mysteriously never charged with Arroyo's murder unlike the others.

21.     The record also revealed that defense counsel knew that the Petitioner's girlfriend, Cassandra Rivera, was also present at the scene of the shooting and accident. Based on such facts being available to appellate counsel, it was objectively unreasonable for

20.

appellate counsel to not investigate and discover that Rivera could've and would've testified at Petitioner's trial that she was with the Petitioner during the exact time of Arroyo's shooting and that Petitioner was unarmed and was not the person who'd fired a gun. In that, appellate counsel should have raised the claim that trial counsel's fail-ure to call Rivera to testify and attest to Petitioner's innocence amounted to deficient performance.

22.    Petitioner further asserts that he was prejudiced by appellate counsel's deficient performance since the claim counsel failed to raise was meritoreous, and there's a reasonable probability that the outcome of his appeal would've been differant since it's obvious that Rivera's testimony would've cast a new light in Petitioner's trial as it'll relate to evidence of Petitioner's innocence and yet, trial counsel failed to call her as a witness for the purpose of introducing such evidence.

## CONCLUSION

For the above and/or herein stated reasons, the Petitioner (Anthony Hernandez), respectfully requests that this honorable court vacate his sentence's and conviction's, grant him an evidentiary hearing, grant him a new trial, and/or grant him any and all Habeas relief this court might deem otherwise just and proper.

EXHIBIT A.- Affidavit of Omar Rodriguez          (2 Pages)
EXHIBIT B.- Affidavit of Linda Hernandez          (1 Pages)
EXHIBIT C - Affidavit of Cassandra Rivera          (3 Pages)
EXHIBIT D - Affidavit of Anthony Hernandez          (2 Pages)

21.

EXHIBIT A (2 PAGES)

STATE OF ILLINOIS )
) SS
COUNTY OF Randolph )

## AFFIDAVIT

I, Omar Rodriguez being first duly sworn upon my oath depose and state that the following matters are both true and correct made upon personal knowledge and belief, and if called as a witness, I am competent to testify thereto: On June 28,2000,at 10:30 pm,I was driving around Bryn-Mar and Kediz looking for a rival gang called the "Simon City Royals " which are my enimes,when I came upon two of them with two females walking down Bryn-Mar going towards Kediz. I pu Pulled up onb the side of them and told them that I was a Royal from Central Park and Sunnyside and if I could hang out with them. They told me to just go up the street to Lemyn and that they,ll meet me there.So I went.When i got there,there was alot of people.After about five hbbb minutes,in,the person I was talking to came up to me and strated talking.Then I told him that I was going to get some more drugs and that I was coming back.When Ileft,I went to Lawndale and Anisle where I ran into Roberto G and Richard C.I told them that I knew where some Royals were at and to follow me.When they left to get into their cars,With out their knowledge,to get a 357 hand gun.WhenI came back,they were ready to go.So I took them to Lemoyn and Bryn-Mar where the Royals were at.When we got there I seen alot of people running towards my car,so I fired two shoots at them and speed away When I got to Bryn-Mar and Kediz,Itold Roberto to get infront of me,as soon as he got infront of me a car full of Royals crashed into Roberto car.When I seen that they were stuck I ran up to the driver side and fired one shot into the car,then I ran away.The next day at 9:00 am two police officers came to my house and took me to Area 5 police station.When I got there the two police officer who brought me there told me that he wanted to make a dealHe said that if I was to say that Anthony Hernadez shot in the Royals car he will let me go,so I told him that Anthony Hernadez killed that Royal,but the officer didn't let me go,instead he sent me to Cook County Jail,charge with First Degree Murder.

Nowthat after two years,I want to stand up and take full

Page 1 of 2

## Affidavit (continued) Page 2 of 2

responslibity for my actions,and say that Anthony Hernadez A.k.a T-bone
was not there with me or that he shot any gun,I was the one who shot that
gun.Anthony Hernadez a.k.a. T-Bone is innocent.

Subscribed and sworn to
before me on the 25<sup>th</sup>day
of ___OCT___, 2002.

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
ELISA REA
Notary Public, State of Illinois
My Commission Exp. 10/11/2004

Respectfully submitted,

_Omar Rodriguez_

— EXHIBIT B (1 PAGE) —

STATE OF ILLINOIS    )
                     )SS
COUNTY OF COOK       )

### AFFIDAVIT

The Affiant, Linda Hernandez, do hereby attest upon her oath that the following statement(s) are true and correct to the best of her personal knowledge and belief:

1. She is the biological mother of Anthony Hernandez, who is currently incarcerated in the Illinois Department of Corrections and housed at the Menard Correctional Center, located at P.O. Box 711, Menard, Illinois 62259;

2. I personally notified Attorney Mike Krecji, legal counsel for my son, Anthony Hernandez. That someone who could verify what my son was doing on the night of the crime, which he has been accused of committing, named Cassandra Rivera, was available as a witness and I did provide him with the information necessary to contact her;

3. During the entire period in which my son, Anthony Hernandez was on trial, Attorney Mike Krecji did not make any effort to call Cassandra Rivera as a alibi witness for my son Anthony Hernandez, in spite of the fact that she would have testified that she was with Anthony Hernandez during such period of time, and had never seen him with a gun or firing any gun at anyone during such period of time. She would have truthfully testified about what she had personally saw on the night of the criminal offense, and would have verified that Anthony Hernandez was not personally involved in such shooting, and had immediately left the area with her and escorted her to her home, where he remained with her until the next afternoon;

4. If called to testify to the facts stated herein, I will appear in court to do so, and although I am the biological mother of Anthony Hernandez and would do what ever I can to aid him when he or any of my other children are in trouble, I would never lie to protect him from facing up to his responsibilities.

1st _____

SWORN and SUBSCRIBED to before me, this _____ day of _August_

2009 A.D.

_____
Notary Public

11-28-2010
_____
My Commission Expiration Date

OFFICIAL SEAL
HECTOR AVILA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-28-2010

-1-

'B'

EXHIBIT C (3 PAGES)

Anthony and I were picked up from his house sometime in the afternoon of June 21, 2000. We were picked up by one of Anthony's friends, at this time I don't remember who. Anthony and I were dropped off on Lawndale and Lawrence, this is where Anthony and his friends always hung out at. I spent the entire night with Anthony and some of his other friends that usually hung out on Lawndale with Anthony as I often did.

As the day went on, Anthony had been drinking and when it got later into the night I told Anthony that I wanted to go home. Anthony wasn't driving so he said that we had to wait till we can get a ride, at this time it was a little past midnight. Anthony and I were the only two left on Lawndale as we continued to wait to find a ride, someone was always sure to come thru Lawndale and so we waited. After waiting a little longer Roberto Gomez pulled up in a gray wagon and Anthony and I got in the back seat of it. As we were driving down Lawndale I could hear a car behind us which made me look back and that's when I seen that the car behind us was flashing it's lights at us as it was speeding up closer to the car we were in. At that time Roberto pulled over and gave way so that the car that was behind us could pull up next to us, this was a small red car.

In the small red car Omar Rodriguez was the driver along with passenger Brian Stein and another guy in the back seat who, at this time I could not see, one of them had hung out on Lawndale earlier this day with us. Omar asked Roberto to pull over, Roberto did and then got out to talk to Omar. Anthony and I stayed in the car and I went on to tell Anthony that I was tired and that I wanted to go home, at this time Roberto returns to the car with one of the guys with him who then got in the front passenger seat. Roberto then tells Anthony that we are going to follow the red car because the car is stolen and us being behind them will keep the police from riding behind them. Roberto also said that after we followed them to where they needed to go that he would then drop off me and Anthony at home.

As we pulled off from Lawndale the passenger in our car leaned out the window and waved to the red car to go in front of us but yet again we were stopped by another car as we were approaching Lawrence Avenue. Anthony then said that in that car was also some of the guys from Lawndale. Omar and the guys from the red car get out as does the passenger from our car and they all go to the other car (dark red) and talk for a few minutes, then when the passenger from our car comes back he said that this other car would be following us as well. As we drive off the other car waited till we passed them and then began to follow behind us, as we pass the car I can see that this dark red car has 4 or 5 guys in it. We drive for a while and then turn down a small

"A"

side street. Roberto says that he thinks that the car in front of us is lost so we slow down and the car behind us flashes his lights, but the car in front of us continued to drive even when we stopped. Roberto then begins to flash his lights attempting to get the attention of the car in front of us, at this time Anthony tells Roberto to just take us home, as we began driving again the red car in front of us was stopped about a half a block up the street, as we got closer we can now see that there are people by the red car, so we pull up behind it.

We were behind the red car waiting when I noticed that there was a few people standing by a gangway on the passenger side of the car. I tell this to Anthony and at this time Anthony and I notice that the guys by the gangway are pointing at the car behind us, Anthony then tells me to get down because he thinks that these guys may have recognized the guys in the car behind us from the neighborhood, I lay my head down on Anthony's lap as I do I hear a loud pop, as I look up I seen the passenger in the front seat reaching out the window, I then hear another two pops. As we were driving off Anthony was yelling that they shot at the car behind us.

At this point Anthony is yelling and swearing at Roberto, and Roberto is yelling at the passenger. I was scared so I kept my head down and I hear Anthony telling Roberto to slow down, I then sit up just as the car behind us is pulling up next to us. As the car approaches us I can see that there was a hole on the passenger side of the windshield, someone in the dark red car yells that he has been shot and I can see that he has blood on his hands and shirt. Anthony tells them to drive away and shortly after we began to drive off a car slammed into us really hard.

For a little while everything was quiet, then everything just started happening so fast. Anthony was saying something to me but I was unable to hear him to well, then he loudly said that we need to get out of the car and run, at this time I start to look around and notice that Roberto and the passenger are already gone. As we get out the car I seen that there was a lot of people attacking a car, it looked as if they were trying to get in the car. As Anthony and I started leaving I noticed Anthony was limping and a little hunched over and he then said that his leg and side were hurt from the impact. As we headed toward a side street I heard a loud pop, as I turned to see where it came from I could only see that the car was still being attacked by a lot of people but could not see where the shot came from.

As we walked, the car that had the hole in the windshield pulled up and told us to get in, it was the same car that the guy who had been shot was in, at that moment everyone who was attacking the other car had come running

and began to get in the dark red car with the hole in the windshield. Anthony was really angry and said that we were not getting in the car, that there was too many people in there and they had a good chance of getting stopped by the police that way. Anthony was mad and yelling about what had happened and that I was there for something like this. We continued to walk till we got to Ridgeway and Lawrence where we caught a cab to my house. Later that morning we were told that someone had been killed and others injured by gunshot wounds. I am coming forward now to let it be known that Anthony Hernandez did not have a gun that night, nor did he kill or shoot anyone. I was with Anthony the entire day this incident took place. Anthony Hernandez is innocent!

I did not come forward sooner cause I was afraid and I didn't want to get involved if I did not have to and I was also told that Anthony had all he needed to prove his innocence without me. I now know that I was wrong and misinformed and I will do whatever is in my power to make things right. I am giving my statement of my own free will, I an not being forced, threatened or bribed by any person.

*\
_Cassandra Rivera_        2-16-09

_Witness_
~~Lida Jerraris~~        2-16-09

"OFFICIAL SEAL"
CARMEN M. FELICIANO
Notary Public, State of Illinois
My Commission Expires Oct. 07, 2009

Subscribed and sworn to before me
this 7 day of Feb 2009
at Chicago, County of Cook, State of Illinois.

Notary Public _Carmen A. Feliciano_

— EXHIBIT D (2 PAGES) —

STATE OF ILLINOIS    )
                 )SS
COUNTY OF RANDOLPH )

### AFFIDAVIT OF VERITY

Now comes Anthony Hernandez, Reg. No. B77118, being fully aware of the crime of perjury and its consequences, do hereby attest upon sworn oath, that the foregoing facts, statements, and assertions are true and correct to the best of his personal knowledge and belief, to wit:

1. I am one of the named-parties in the attached legal cause pending before bar;

2. In relation to this cause, I have been continually deprived of my civil liberty for a period of time stemming from my initial date of arrest, (March 23, 2001) up to and including this date in which this affidavit is being prepared. Although my incarceration remains on-going under the care and custody of the Illinois Department of Corrections;

3. I was arrested in relation to a shooting that occurred on or about the 21st of June 2000, which resulted in the death of an individual. In spite of being physically present at the scene when such shooting occurred, I did not at such time know specifically of anyone being killed, and did not know who such victim actually was. During such period of time I did not have in my possession any type of firearm, nor did I operate any type of firearm at such time, nor did I shoot anyone. After shooting began, I immediately left the area with my date and eventually caught a cab and went to my date's house;

4. It was not until mid-afternoon of the following day, that I learned that someone had been shot and killed in the area in which I had been. Because it was my personal belief that such shooting may have in fact been gang-related, I did not come forward and/or communicate with police, or provide any information regarding such shooting for concern over my own personal safety and that of my family members and other loved ones;

5. Within a 24 hour period following such shooting, I became aware that I was wanted by police for questioning in regards to the shooting that had occurred, yet as expressed in the fourth paragraph above, I did not communicate with police personnel;

6. Following my arrest by police, I remained in the police station for half a day before legal counsel showed up to represent me. I was then sent to another police station and placed in a couple of lineups, and then charged with murder the next day (and attempted murder along with possession of a firearm);

C

7. Prior to the Affiant's trial taking place, he had in fact informed his attorney that he had a alibi witness, who would take the stand and verify that she was with him at the time this incident occurred, and that he was not a active participant, did not have a firearm, and did not shoot anyone. Having left the area with her and went to her home, where he remained until the next afternoon;

8. However, said defense counsel never discussed the case with such alibi witness, never requested her to appear, and did not make any arrangements to have her provide the exculpatory testimony which she would have provided under oath in favor of the Affiant;

9. Defense counsel was given her full name, address, and phone number, and knew specifically how to reach such witness at any time but failed to contact her; and

10. Affiant, sayeth not.

/s/ _Anthony Hernandez_
Affiant

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned, pursuant to 735 ILCS 5/1-109, do hereby state under penalty of perjury, that he has read the aforementioned Affidavit of Verity, and that the information contained therein is true and correct to the best of his personal knowledge and belief.

/s/ _Anthony Hernandez_
Declarer

Date: _Aug 08th 2010_ 2010

To Whom it may concern,                    4-18-13

I am sending out my paper work as I am aware of the time limitation, We had been on lock down since Feb. 5-2013 until a couple of weeks ago we weren't able to have access to the library to do research all mail out going as well as in-coming was at halt.

Anthony Hunt
B77118
P.O. Box 1000
Menard Il 62259