IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
| ANTHONY HERNANDEZ, B77118, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 13 C 3394 |
| | ) | |
| | ) | |
| RICK HARRINGTON, Warden, | ) | |
| Menard Correctional Center, | ) | The Honorable |
| | ) | Robert W. Gettleman, |
| Respondent. | ) | Judge Presiding. |

## ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts (Section 2254 Rules), and this Court's July 1, 2013 order, Doc. 8, respondent RICK HARRINGTON answers petitioner's 28 U.S.C. § 2254 petition for a writ of habeas corpus as follows:

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

Petitioner, Anthony Hernandez, is incarcerated at the Menard Correctional Center in Menard, Illinois, where he is in the custody of warden Rick Harrington.

### Trial

Following a bench trial in the Circuit Court of Cook County, Illinois, petitioner was convicted of first degree murder, two counts of attempted first degree murder, and unlawful use of a weapon by a felon. Exh. V at C95. He was sentenced to fifty-five-year term of imprisonment for first degree murder, two concurrent ten-

year terms of imprisonment for the two attempted murder convictions, and a concurrent five-year term of imprisonment for unlawful use of a weapon by a felon. *Id.* Petitioner has not attempted to rebut the state court's statement of facts; accordingly, the following summary of the state appellate court's factual recitation, is presumed correct. *See* 28 U.S.C. § 2254(e)(1); *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009).

Brian Stein, a member of the Spanish Cobras gang, testified that on the night of June 27, 2000, he and a fellow Cobra, Omar Rodriguez, stole a Toyota Camry and drove it to the territory of another gang, the Simon City Royals. Exh. D at 2. There, they encountered Joey Arroyo, the victim and a member of the Royals, who was with some friends. *Id.* Stein and Rodriguez told the group that they, too, were Royals, and Arroyo invited them to a gathering of Royals at nearby Legion Park. *Id.* Stein and Rodriguez went to the park shortly thereafter, then left and joined other members of the Cobras at Gompers Park. *Id.* Stein testified that many members of the Cobras were in Gompers Park, including petitioner, the leader of the Cobras. *Id.*

Stein testified that Rodriguez said "let's go get them," at which point the Cobras got into three cars and drove to the park where Stein and Rodriguez had seen the Royals. *Id.* Stein and Rodriguez rode in the stolen Toyota Camry, *id.*, Richard Cardenas rode in a red Acura, *id.* at 3, and petitioner rode in the backseat

of a gray station wagon, with his girlfriend Cassandra in the front passenger seat and Roberto Gomez driving, *id.* at 2-3.

Stein testified that when the three cars arrived at the park, a red car driven by the Royals crashed into the gray station wagon in which petitioner was riding. *Id.* at 3. Stein saw Cardenas trying to pull one of the Royals out of their car. *Id.* Stein then saw petitioner approach the driver's side of the Royals' car and reach his arm through the window, at which point Stein heard two gunshots and saw two flashes of light. *Id.* Stein testified that petitioner was the only person at the Royals' car at the time of the gunshots. *Id.*

Malaysa Riordan-Korner, a passenger in the Royals' car when it crashed into the gray station wagon, testified that she was sitting in the front passenger seat and that Arroyo was sitting between her and the driver. *Id.* After the crash, Arroyo hunched over her, trying to cover her. *Id.* at 4. After she heard gunshots from very close by, she and Arroyo "flew" into the passenger door, and Arroyo stopped moving. *Id.* She climbed out of the car, and petitioner told her that it was "Cobras' world" and "that is what the Royals get." *Id.* The Cook County medical examiner testified that Arroyo's death was consistent with homicide, and that the trajectory of the bullet was consistent with the victim having been hunched over and covering someone on the front seat of the vehicle. *Id.* at 15.

Cardenas, who had pleaded guilty to conspiracy to commit murder for his involvement in Arroyo's death and was serving a six-and-a-half year sentence, *id.* at

3

6, corroborated much of Stein's testimony. He testified that Stein and Rodriguez were in the Toyota Camry, he was in the red Acura, and petitioner, Cassandra, and Gomez were in the gray station wagon. *Id.* He further testified that after the red car crashed into the gray station wagon, he tried to pull the driver out of the red car. *Id.* As he did so, he heard a gunshot from behind him and to his right. *Id.*

Although Cardenas testified that he did not see anyone standing behind him to his right when he turned around, *id.*, the prosecution impeached him with a handwritten statement he had given three days after the murder. *Id.* at 7. In that statement, Cardenas recounted that when he was trying to pull the man out of the red car, he heard a gunshot fired from "very close" to his right side and into the red car, and that when he turned around he saw petitioner turning away with a gun in his hand. *Id.*

Gomez testified that he, too, had pleaded guilty to first degree murder and attempted murder based on these events. *Id.* at 10. Gomez denied that petitioner was in his car that night and asserted that it was Rodriguez who walked toward the red car and fired a shot into it. *Id.* at 11-12. He was impeached with his videotaped statement, in which he stated that petitioner was in his car that night and that he saw petitioner approach the red car and fire a shot. *Id.* at 11.

Finally, Rodriguez testified that he had pleaded guilty to murdering Arroyo. *Id.* at 13. Rodriguez denied that petitioner had been at the park with the other members of the Cobras and stated that he did not see who fired the shot. *Id.* at 13.

4

He was impeached with his videotaped statement, in which he stated that he had asked petitioner that night if he had a gun and that petitioner indicated that he did. *Id.* He also stated that after the car crash he saw petitioner approach the Royals' car with a gun and then heard gunshots. *Id.* at 13-14.

Cardenas, Gomez, and Rodriguez all testified that their statements to the police that petitioner had been the shooter were products of police threats and abuse. *Id.* at 7-8, 10-12, 14. The police and assistant state's attorneys (ASAs)who interviewed them and took their statements denied those allegations. *Id.* at 9, 12, 14-15.

The trial court found that the prior consistent statements of Cardenas, Gomez and Rodriguez constituted the "main thrust of the evidence," and admitted those statements as substantive evidence. *Id.* at 15-16. The court further stated that "its credibility determination was an 'easy one,' that it did not believe the trial testimony of Cardenas, Gomez and Rodriguez, and that their prior statements were the truth." *Id.* at 16. The court found that their statements "fully and consistently detailed the sequence of events the night of Arroyo's murder," and were corroborated by the testimony of the detectives and ASAs. *Id.* The court stated that the claims of abuse and threats were "particularly incredible because each admitted all of the factual details in their prior statements, and recanted only their statements implicating [petitioner] as the shooter." *Id.* The court found that Cardenas, Gomez, and Rodriguez "had a much stronger motive to lie at trial than

5

they did when they gave their prior statements," noting that "each witness got nothing out of implicating [petitioner] as the shooter when they gave their prior statements," as opposed to when they recanted at trial, after each already had been convicted and sentenced and "was being brought out to testify against [petitioner], their gang leader, in his presence." *Id.*

## Direct Appeal

Petitioner appealed, arguing that trial counsel was ineffective for failing to impeach Rodriguez with his prior statement, contained in an affidavit, that he himself had shot the victim. *See* Exhs. A & C. On November 15, 2006, the state appellate court affirmed petitioner's convictions and sentence. Exh. D at 23.

Petitioner filed a petition for leave to appeal (PLA) in the state supreme court, raising the same ineffective assistance claim. Exh. E. On March 28, 2007, the Illinois Supreme Court denied the PLA. Exh. F.

## Postconviction

On August 20, 2009, petitioner filed a "Petition for Postconviction Relief from Judgment Pursuant to the Post-Judgment Act 735 ILCS 5/2-1401." Exh. X at 7-50. Petition challenged the validity of Illinois's first degree murder and sentencing statutes. *See id.* at 11-50. On November 18, 2009, the trial court dismissed the petition, construing it as a postconviction petition. Exh. X at 4, 59-60; Exh. J at 3. Petitioner did not appeal. Exh. J at 4 (noting that petitioner did not file appeal challenging dismissal).

On August 8, 2010, petitioner filed a second postconviction petition. Exh. Y at 9-33. Petitioner argued that trial counsel was ineffective for failing to call Cassandra as an alibi witness and that appellate counsel on direct appeal was ineffective for failing to raise trial counsel's ineffectiveness. *Id.* at 16-26. The trial court denied petitioner leave to file the petition on the ground that it was an unauthorized successive postconviction petition. *Id.* at 35. Petitioner appealed, arguing that the trial court erred in dismissing his petition as successive because the trial court misconstrued the first petition as being filed under the Postconviction Hearing Act. Exhs G & I. The state appellate court held the trial court did not err in treating the petition as a successive postconviction petition and affirmed the judgment denying petitioner leave to file. Exh. J at 4. Petitioner filed a petition for rehearing, Exh. K, which the appellate court denied, Exh. L.

Petitioner's ensuing PLA argued that the trial court failed to give petitioner notice that it was construing his first petition as a postconviction petition. Exh. M. The Illinois Supreme Court denied the PLA on January 30, 2013. Exh. N.

### Habeas Petition

On May 3, 2013,[1] petitioner filed his habeas petition, *see* 28 U.S.C. § 2254, alleging that that: (1) trial counsel was ineffective for failing to impeach Rodriguez with his prior statement that he himself had shot the victim (Claim 1); (2) trial counsel was ineffective for failing to call petitioner's girlfriend, Cassandra Rivera,

---

[1] According to this Court's docket, the envelope containing the petition was postmarked May 3, 2013.

as an alibi witness (Claim 2); and (3) appellate counsel on direct appeal was ineffective for failing to raise trial counsel's failure to interview and call Cassandra Rivera as an alibi witness (Claim 3). Doc. 1.

This Court ordered petitioner to show cause why his petition should not be dismissed as untimely. Doc. 6. Petitioner responded that in March 2007, when his direct PLA was denied, he was being held at Tamms Correctional Center, where he lacked "meaningful access to a suitable law library and/or legal assistance." Doc. 7 at 2. He alleged that he was then transferred to Pontiac Correctional Center "around the middle of the year," where he was not allowed to access the "main prison law library" during a six-month "step-down" period, during which he was being transitioned into the maximum security prison after his stay in the super-maximum security facility at Tamms. *Id.* at 3. Instead, petitioner alleges that he had access only to an alternate library at Pontiac that contained "old and out-dated books." *Id.* at 4.

In November 2007, petitioner was transferred to Menard Correctional Center, where he alleges he had access to a similarly inadequate alternate library until July 2008, when he was given access to the main library. *Id.* at 5-6. At that point, petitioner was told that he would be given access to the main library at such time as the library schedule permitted, and that only prisoners with upcoming filing deadlines had regular library access. *Id.* at 6-7. Petitioner also complains of "constant lockdowns." *Id.* at 7. Petitioner alleges that he discovered the possibility

8

of federal habeas relief only "a couple of months or so" prior to filing his habeas petition. *Id.*

Petitioner has exhausted all available state court remedies for his habeas claims. The claims are not barred by non-retroactivity. Pursuant to Section 2254 Rule 5, respondent has electronically filed the following exhibits with this Answer:

Exhibit A: Brief and argument for defendant-appellant in *People v. Hernandez*, No. 1-04-3368;

Exhibit B: Brief and argument for plaintiff-appellee in *People v. Hernandez*, No. 1-04-3368;

Exhibit C: Reply brief and argument for defendant-appellant in *People v. Hernandez*, No. 1-04-3368;

Exhibit D: Order in *People v. Hernandez*, No. 1-04-3368 (Ill. App. Ct. Nov. 15, 2006);

Exhibit E: PLA in *People v. Hernandez*, No. 103962;

Exhibit F: Order denying PLA in *People v. Hernandez*, No. 103962 (Ill. 2007);

Exhibit G: Brief and argument for defendant-appellant in *People v. Hernandez*, No. 1-10-3612;

Exhibit H: Brief and argument for plaintiff-appellee in *People v. Hernandez*, No. 1-10-3612;

Exhibit I: Reply brief and argument for defendant-appellant in *People v. Hernandez*, No. 1-10-3612;

Exhibit J: Order in *People v. Hernandez*, No. 1-10-3612 (Ill. App. Ct. Aug. 30, 2012);

Exhibit K: Petition for rehearing in *People v. Hernandez*, No. 1-10-3612;

9

Exhibit L:    Order denying petition for rehearing in *People v. Hernandez*, No. 1-10-3612 (Ill. App. Ct. Sept. 21, 2012);

Exhibit M:    PLA in *People v. Hernandez*, No. 115127;

Exhibit N:    Order denying PLA in *People v. Hernandez*, No. 115127 (Ill. 2013);

Exhibit O:    Report of proceedings in *People v. Hernandez*, No. 01 CR 13645 (Vol. 1 of 6);

Exhibit P:    Report of proceedings in *People v. Hernandez*, No. 01 CR 13645 (Vol. 2 of 6);

Exhibit Q:    Report of proceedings in *People v. Hernandez*, No. 01 CR 13645 (Vol. 3 of 6);

Exhibit R:    Report of proceedings in *People v. Hernandez*, No. 01 CR 13645 (Vol. 4 of 6);

Exhibit S:    Report of proceedings in *People v. Hernandez*, No. 01 CR 13645 (Vol. 5 of 6);

Exhibit T:    Report of proceedings in *People v. Hernandez*, No. 01 CR 13645 (Vol. 6 of 6);

Exhibit U:    Report of proceedings for postconviction proceedings in *People v. Hernandez*, No. 01 CR 13645;

Exhibit V:    Common law record in *People v. Hernandez*, No. 01 CR 13645;

Exhibit W:    Supplemental common law record in *People v. Hernandez*, No. 01 CR 13645;

Exhibit X:    Common law record for postconviction proceedings in *People v. Hernandez*, No. 01 CR 13645;

Exhibit Y:    Common law record for successive postconviction proceedings in *People v. Hernandez*, No. 01 CR 13645;

Exhibit Z:    Affidavit of Jennifer Robison; and

Exhibit AA:    Affidavit of Cynthia Gimber.

## ARGUMENT IN OPPOSITION TO HABEAS RELIEF

**I.    The Petition Is Untimely.**

**A.    The Petition Is Untimely Under § 2244(d)(1)(A).**

AEDPA "impose[s] a tight time constraint on federal habeas petitioners."
*Day v. McDonough*, 547 U.S. 198, 202 (2006). Under § 2244(d)(1)(A), the one-year
statute of limitations began to run on "the date on which the judgment became final
by the conclusion of direct review or the expiration of the time for seeking such
review." 28 U.S.C. § 2244(d)(1)(A). Here, direct review concluded on June 26, 2007,
ninety days after the Illinois Supreme Court denied petitioner's PLA on direct
review on March 28, 2007, *see* Exh. F, when the time to file a certiorari petition in
the United States Supreme Court expired. *Gonzalez v. Thaler*, 132 S. Ct. 641, 653-
54 (2012); *Jimenez v. Quarterman*, 129 S. Ct. 681, 685 (2009). The one-year
limitations period expired on June 26, 2008.

From that date, almost five years (1,772 days) lapsed before petitioner filed
this habeas petition on May 3, 2012. Doc. 1. Neither petitioner's first
postconviction petition nor his successive postconviction petition had any tolling
effect under § 2244(d)(2) because those pleadings were filed after the limitations
period expired on June 27, 2008. *DeJesus v. Acevedo*, 567 F.3d 941, 943 (7th Cir.
2009) ("a state proceeding that does not begin until the federal year has expired is
irrelevant"); *Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005) (state
collateral proceeding initiated after statute of limitations expired has no tolling

11

effect under § 2244(d)(2)).  In addition, petitioner's successive postconviction petition had no tolling effect because it was denied on the ground that it was filed without authorization.  *See* Exh. Y at 35; Exh. J at 4; *Martinez v. Jones*, 556 F.3d 637, 638-39 (7th Cir. 2009) (no statutory tolling for attempted successive postconviction petition if leave to file is denied).  Therefore, calculated under Section 2244(d)(1)(A), the petition, filed well after the expiration of the limitations period, is untimely.

### B.   Petitioner Is Entitled to Neither Equitable nor Statutory Tolling.

Petitioner bears the burden of presenting evidence to show that his petition is timely.  *Ray v. Clements*, 700 F.3d 993, 1008 (7th Cir. 2012) (when respondent "raises an AEDPA statute of limitations defense, the petitioner must come forward with some evidence to support his claim that . . . 365 countable days have not elapsed"; and only "[a]fter the petitioner makes this evidentiary showing [does] the burden shift[] to the government to prove that the limitations period has run").  Equitable tolling is an "exceptional remedy," available only if a petitioner presents evidence demonstrating that (a) "extraordinary circumstances outside of his control and through no fault of his own prevented him from timely filing his petition," and that (b) "he has diligently pursued his claim, despite the obstacle."  *Tucker v. Kingston*, 538 F.3d 732, 734-35 (7th Cir. 2008); *see also Taylor v. Michael*, 724 F.3d 806, 810 (7th Cir. 2013).  And to earn statutory tolling under 28 U.S.C. § 2244(d)(1)(B), a petitioner must show that an unconstitutional state-created

12

impediment "prevented" him from filing his petition. § 2244(d)(1)(B); *see also Lloyd v. Van Natta*, 296 F.3d 630, 633 (7th Cir. 2002) ("the plain language of [§ 2244(d)(1)(B)] makes clear that whatever constitutes an impediment must *prevent* a prisoner from filing his petition") (emphasis original). If the petitioner makes this showing, the one-year limitations period is measured from the date upon which that impediment is removed. § 2244(d)(1)(B). Petitioner's allegations that "constant lockdowns" and access to alternate libraries with "old and out-dated books," Doc. 7 at 4, 7, prevented him from timely filing his habeas petition warrant neither equitable nor statutory tolling.

Petitioner argues that lack of library access at Tamms Correctional Center and lockdowns, combined with the inadequate alternate libraries to which he had access while participating in the "step-down" program at Pontiac and Menard Correctional Centers, prevented him from timely filing his habeas petition. *See* Doc. 7 at 2-8. But conditions at Tamms Correctional Center are irrelevant to the timeliness of the petition; when petitioner's judgment became final on June 26, 2007 and the limitations period began running, he was imprisoned at Pontiac, having arrived there on May 18, 2007, and where he would remain until his transfer to Menard on November 21, 2007. Exh. Z. During this time at Pontiac, there were no lockdowns. *Id.* And, while at Pontiac, petitioner had access to the North Administrative 4 segregation law library, which housed the code volumes

13

containing 28 U.S.C. § 2254 (the federal habeas statute for petitioners in state custody) and 28 U.S.C. § 2244 (the statute of limitations). *Id.*

Thus, from June 27, 2007 (when the one-year limitations period began running) until November 21, 2007 (when petitioner was transferred to Menard), petitioner had an uninterrupted span of 147 days within which he could access the relevant federal statutes and draft and timely file his habeas petition. This alone is more than enough time to draft and timely file a habeas petition. *See Taylor*, 724 F.3d at 812 ("several months" sufficient time for prisoner to timely file habeas petition); *Jackson v. Rednour*, No. 10 C 6709, 2011 WL 5980984, *2 (N.D. Ill. Nov. 28, 2011) (prisoner had "more than enough time to visit the legal library and consult the necessary legal materials" where prisoner's cellhouse "was not on lockdown for approximately 100 days); *Plummer v. Gaetz*, No. 08 C 1885, 2009 WL 458620, *3 (N.D. Ill. Feb. 23, 2009) (prisoner not prevented from timely filing habeas petition if not on lockdown for eighty-seven days). Indeed, petitioner acknowledges as much, admitting that he only needed "a couple of months" after discovering the existence of the federal habeas remedy to draft and file this habeas petition. Doc. 7 at 7.

But petitioner had even more time to timely file his petition. On November 21, 2007, petitioner was transferred to Menard Correctional Center. Exh. AA. Between that date and June 26, 2008 (when the one-year limitations period expired) petitioner was subject to a total of sixty-six days of lockdown, leaving him

14

with an additional 151 lockdown-free days. *See id.* Again, the segregation satellite law library to which petitioner had access until he was granted access to the main law library "around July 2008," Doc. 7 at 6, included the code volumes containing 28 U.S.C. § 2254 and 28 U.S.C. § 2244. Exh. AA. On this record, petitioner is not entitled to a later start date under § 2244(d)(1)(B) or equitable tolling.

### 1. Petitioner is not entitled to equitable tolling.

First, equitable tolling does not apply. Altogether, petitioner had a total of 298 days during the one-year limitations period to timely file his habeas petition or, failing that, a state postconviction petition that would have tolled the § 2244(d) limitations period under § 2244(d)(2). The sixty-six days of lockdowns dispersed over this one-year period were not "extraordinary circumstances outside of [petitioner's] control [that] prevented him from timely filing his [federal habeas] petition," and petitioner's failure to timely file a habeas petition during that period does not demonstrate that he "diligently pursued his claim, despite the obstacle." *See Tucker*, 538 F.3d at 734-35. "[T]he law is clear that the circumstances supporting equitable tolling must be extraordinary. Restrictions on prison movement are not 'extraordinary.'" *Green v. Rednour*, No. 10 C 6088, 2011 WL 4435641, at *4 (N.D. Ill. Sept. 22, 2011); *see also Knight v. Bartley*, No. 07 C 6098, 2011 WL 9862046, at *3 (N.D. Ill. Mar. 4, 2011) ("Restrictions on a prisoner's activities are, unfortunately, a perfectly ordinary incident of prison life . . . ."); *Blackwell v. McCann*, No. 06 C 6789, 2008 WL 4442631, at *7 (N.D. Ill. Sept. 29, 2008) (persistent lockdowns "are not 'extraordinary' in prisons, and if they justified

15

equitable tolling, the habeas statute of limitations period would be tolled for many prisoners, and its purposes would be defeated."); *Taylor v. Ryker*, No. 06 C 4665, 2007 WL 1280630, at *4 (N.D. Ill. Apr. 26, 2007) ("penitentiary conditions, such as segregation or lock-down, resulting in limited or no access to the prison law library, do not establish the extraordinary circumstances required to justify equitable tolling."). And, to the extent that petitioner complains that he lacked legal assistance, Doc. 7 at 4, 6, that does not equitably toll the limitations period either. *Rice v. Atchison*, No. 12 C 8304, 2013 WL 870239, at *3 (N.D. Ill. Mar. 7, 2013) (citing *Jones v. Hulick*, 449 F.3d 784, 789 (7th Cir. 2006)). There is "nothing atypical" about prisoner complaints of "limited resources and lack of familiarity with the law." *Tucker*, 538 F.3d at 734. Accordingly, petitioner is not entitled to equitable tolling on this record. *See Green*, 2011 WL 4435641, at *4-5 (equitable tolling denied where, among other things, petitioner failed to show how lockdown status interfered with ability to mail petition: "to characterize [petitioner's] allegations about institutional lockdown as sufficient to support equitable tolling would effectively eviscerate the statute of limitations for any prisoner at Menard"); *Jackson*, 2011 WL 5980984, at *2 (equitable tolling denied; although petitioner filed document showing days during which his cellhouse at Menard was on lockdown, petitioner not on lockdown for approximately 100 days, "more than enough time to visit the legal library and consult the necessary legal materials"); *Blackwell*, 2008 WL 4442631, at *7 (instability in prison and persistent lockdowns not extraordinary

16

and do not warrant equitable tolling); *see also Adams v. Chandler*, No. 11 C 691, 2011 WL 3510953, at *3 (N.D. Ill. 2011) (no equitable tolling where petitioner alleged that he experienced frequent thirty-day lockdowns, five months of segregation, and loss of legal property box; obstacles were "not extraordinary," nor were petitioner's attempts to file diligent).

### 2.   Petitioner is not entitled to statutory tolling.

Second, petitioner is ineligible for statutory tolling under § 2244(d)(1)(B). Although lack of library access can, "in principle, be an 'impediment' to the filing of a collateral attack" under a statutory-tolling theory, *Estramera*, 724 F.3d at 776, there is no basis for tolling here.  Again, petitioner had 299 lockdown-free days after the conclusion of direct review within which to timely file his federal habeas petition.  *See* Exhs. Z & AA.  That is far more than the 100 days found to be "more than enough time to visit the legal library and consult the necessary legal materials" in *Jackson*.  2011 WL 5980984, at *2.  Lockdowns could not, therefore, have "prevented" petitioner from filing his petition during the one-year limitations period.  *See Taylor*, 724 F.3d at 811-12; *see also Lloyd*, 296 F.3d at 633 ("the plain language of the statute makes clear that whatever constitutes an impediment must *prevent* a prisoner from filing his petition") (emphasis original).

Moreover, intermittent lockdowns, alone, do not lend themselves to a § 2244(d)(1)(B) analysis.  That subsection contemplates an uninterrupted impediment from whose removal the one-year limitations period can be measured,

not a series of intermittent obstacles interlarded with significant time periods during which the obstacles are absent. *See* 28 U.S.C. § 2244(d)(1)(B) (contemplated measurement of limitations period from "the date on which the impediment to filing an application . . . is removed"); *see also Estramera*, 724 F.3d at 776-77 (allowing that lack of library access might constitute § 2244(d)(1)(B) "impediment" where petitioner alleged law-library access denied for one-year period "between June 2008 and July 2009").

Nor could the quality of the segregation libraries justify statutory tolling. Petitioner asserts that he was prevented from discovering the existence of habeas review for nearly six years because the law libraries to which he had access until July 2008 were inferior to the main law library to which he had access after that date. Doc. 7 at 2-7. But the segregation libraries at both Pontiac and Menard, to which petitioner had access during the one-year period, included the code volumes containing the federal habeas statutes. Exhs. Z & AA. And even if the segregation libraries were so inadequate as to entitle petitioner to start the limitations period in July 2008 when he gained access to the main prison law library, Doc. 7 at 6, his petition would still be untimely; petitioner did not file his first postconviction petition until August 20, 2009, Exh. X at 7-50, more than a year after the supposed impediment of inadequate library facilities was removed.

Accordingly, the § 2244(d) limitations period expired on June 26, 2008, one year after the his judgment of conviction became final on June 26, 2007. Petitioner's § 2254 petition was, consequently, late when he mailed it on May 6,

2013.  Given the importance of the interests of comity, finality, accuracy, and efficiency served by § 2244(d)'s statute of limitations and the record's reassurance that lockdowns did not prevent petitioner from filing his habeas petition within it, the petition should be dismissed as untimely.  *See Wood v. Milyard*, 132 S.Ct. 1826, 1833 (2012) ("The AEDPA statute of limitation promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a reasonable time.") *Duncan v. Walker*, 533 U.S. 167, 179 (7th Cir. 2001) ("The 1–year limitation period of § 2244(d)(1) quite plainly serves the well-recognized interest in the finality of state court judgments.").

### C.    Petitioner Fails to Show He Is Actually Innocent, Such as to Excuse His Petition's Untimeliness.

Petitioner fails to meet his heavy burden of demonstrating his innocence so convincingly that no reasonable juror would have convicted him in light of his allegedly new evidence.  *McQuiggan v. Perkins*, 133 S. Ct. 1924, 1928, 1931-32 (2013) (actual innocence can serve as gateway to reaching untimely habeas claims); *Schlup v. Delo*, 513 U.S. 298, 329 (1995); *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005).  "[T]enable actual-innocence gateway pleas are rare," for the threshold showing is "'demanding' and seldom met."  *McQuiggin*, 133 S. Ct. at 1928 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)); *see Schlup*, 513 U.S. at 321 (actual innocence exception limited to "extremely rare" and "extraordinary case[s]").  "[A]

prisoner must have documentary, biological (DNA), or other powerful evidence" of his innocence: "perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes*, 403 F.3d at 938 (citing *Schlup*, 513 U.S. at 324).

Here, petitioner offers no reliable new evidence that establishes his innocence.  Instead, he offers three affidavits, one from a fellow gang member, one from his girlfriend, and one from his mother.  First, he offers the affidavit of Omar Rodriguez, recanting his videotaped statement implicating petitioner, just as he did at trial, and providing essentially the same story he offered in his live testimony. *Compare* Doc. 1 at 22-23 *with* Exh. D at 13-14.  In this respect, the evidence is not "new."  Nor is it reliable.  Rodriguez departs from his testimony only to confess that he, rather than an unknown gunman, killed the victim, and that petitioner was not at the scene of the crime at all.  Doc. 1 at 22-23.  As the state appellate court explained, Rodriguez's new, slightly amended narrative is not reliable for the same reason the trial court did not credit Rodriguez's trial testimony over his inculpatory videotaped statement: Rodriguez had a "much stronger motive" to lie after he had been convicted and sentenced than he did when he gave the videotaped statement, at which point he "got nothing out of implicating [petitioner] as the shooter."  Exh. D at 16.  This same conclusion obtains for the affidavit.  *See Mendiola v. Shomig,* 224 F.3d 589, 593 (7th Cir. 2000) (emphasizing that post-trial recantations are inherently unreliable).  Moreover, this affidavit does not overcome the weight of the evidence of petitioner's guilt.  Exh. D at 22-23.  Brian Stein "gave unrefuted

20

testimony that he saw [petitioner] approach the victim's car and reach his arm through its window, and then heard two gunshots and saw two flashes of light," and the trial court "believed the prior statements of Cardenas, Gomez, and Rodriguez, all of which implicated [petitioner] as the shooter, and . . . it did not believe their trial testimony." Exh. D at 22-23. At most, the Rodriguez affidavit presents an alternative theory that is more than counterbalanced by the trial evidence, and this is insufficient to meet *Schlup*'s demanding standard. *See Smith v. McKee*, 593 F.3d 374, 388-89 (7th Cir. 2010) (reaffirming that potentially exculpatory evidence counterbalanced by inculpatory trial proof insufficient to meet *Schlup*); *Hayes*, 403 F.3d at 938 (rejecting actual innocence argument based on six proposed alibi witnesses whose accounts merely provided alternate description of events described by six state eyewitnesses).

Rodriguez's affidavit also is contradicted by petitioner's remaining two affidavits. Cassandra Rivera, petitioner's girlfriend, Exh. D at 2, avers that, contrary to Rodriguez's affidavit, petitioner was at the scene of the crime, but he never fired a weapon. Doc. 1 at 25-27. Petitioner's mother also avers that Cassandra Rivera would testify that, contrary to Rodriguez's affidavit, petitioner *was* at the scene of the crime and that he immediately escorted her home after the shooting. Doc. 1 at 24. Neither affidavit is "powerful evidence" of his innocence, and is certainly far less reliable for actual innocence purposes than an affidavit of someone such as a "non-relative who placed [petitioner] out of the city, with credit

21

card slips, photographs, and phone logs to back up the claim." *Hayes*, 403 F.3d at 938 (citing *Schlup*, 513 U.S. at 324).

In sum, petitioner's habeas petition is untimely under § 2244(d)(1) and there is no reason to relax the limitations period. Accordingly, this Court should dismiss petitioner's habeas petition with prejudice.

## II.  In the Alternative, This Court Should Deny Petitioner's Claims Because They Are Procedurally Defaulted and Meritless.

### A.  Petitioner's Claims Are Procedurally Defaulted

#### 1.  Petitioner failed to raise Claims 2 and 3 through one complete round of state-court review.

Claims 2 (that trial counsel was ineffective for failing to call Cassandra as an alibi witness) and 3 (that appellate counsel on direct appeal was ineffective for failing to raise trial counsel's ineffectiveness related to Cassandra) are defaulted because petitioner failed to raise them through one complete round of state-court review. To preserve a claim for federal habeas review, a state prisoner must "assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008) (quoting *Lewis v. Sternes,* 390 F.3d 1019, 1025 (7th Cir. 2004)); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 844-48 (1999). "[I]n Illinois, this means that a petitioner must have . . . appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court." *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007).

22

Here, petitioner raised Claims 2 and 3 in his successive postconviction petition, *see* Exh. Y at 9-33, but he abandoned them on appeal, and omitted them from his PLA, where he challenged only the trial court's characterization of his petition as an unauthorized successive petition, *see* Exhs. G, I & M. Accordingly, because petitioner failed to raise these claims through one complete round of state-court review, they are procedurally defaulted.

### 2. Claims 1, 2, and 3 were disposed of on independent and adequate state law grounds.

When a state court resolves a federal claim by relying on a state law ground that is independent of the federal question and adequate to support the judgment, the claim is not open to federal habeas review. *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010). Claim 1 was disposed of on the state law ground of forfeiture and Claims 2 and 3 were rejected on the ground that they were raised in an unauthorized successive postconviction petition. Therefore, all three claims are procedurally defaulted by virtue of independent and adequate state law grounds.

Claim 1 — that trial counsel was ineffective for failing to impeach Rodriguez with his prior statement, contained in an affidavit, that he himself had shot the victim — was disposed of on the independent and adequate state law ground of forfeiture. The state appellate court ruled that the petitioner had forfeited review of his claim by failing to raise this basis for counsel's ineffectiveness in his post-trial motion:

> Initially, we observe that [petitioner] did not raise these
> arguments [that counsel was ineffective for failing to impeach

> Rodriguez with his affidavit in which he claimed to have shot Arroyo
> himself] in his post-trial motion. In his motion for a new trial,
> [petitioner] argued that trial counsel was ineffective for failing to
> utilize Rodriguez's affidavit as a prior *consistent* statement in order to
> rebut the suggestion of recent fabrication that the State raised at trial.
> On appeal, [petitioner] essentially claims that trial counsel was
> ineffective for failing to utilize the affidavit as a prior *inconsistent*
> statement in order to impeach Rodriguez's trial testimony and
> videotaped statement. Where [petitioner] fails to raise an issue in his
> post-trial motion, it is waived for purposes of appeal. *People v. Enoch*,
> 122 Ill. 2d 176, 186 [522 N.E.2d 1124, 1129-30] (1988) (failure to raise
> an issue in a post-trial motion results in waiver of that issue on
> appeal).

Exh. A at 19-20 (emphasis original). This forfeiture decision is independent of

federal law, because it relies wholly upon state procedural rules and does not

address the underlying federal constitutional issue. *See, e.g., Szabo v. Walls*, 313

F.3d 392, 395-96 (7th Cir. 2002) (state court's forfeiture decision independent of

federal law) (citing *Stewart v. Smith*, 536 U.S. 856 (2002), and *Ake v. Oklahoma*,

470 U.S. 68 (1985)).

Furthermore, the state appellate court's forfeiture ruling is adequate to block

federal review because Illinois's rule requiring defendants to raise allegations of

ineffective assistance in a post-trial motion to preserve them for appeal is well

established and regularly followed. *See Szabo*, 313 F.3d at 395-96 ("A state is

entitled to treat as forfeited a proposition that was not presented in the right court,

in the right way, and at the right time — as state rules define those courts, ways,

and times."); *Gomez v. Jaimet*, 350 F.3d 673, 677-78 (7th Cir. 2003) (state court's

application of *Enoch* and post-trial motion requirement constituted independent

and adequate state law ground barring federal habeas review); *Enoch*, 522 N.E.2d at 1129-30 (explaining Illinois's forfeiture rule); *People v. Ramos*, 791 N.E.2d 592, 599 (Ill. App. Ct. 2003) (applying forfeiture rule to defendant's failure to include ineffectiveness claim in post-trial motion).

Nor can the state appellate court's alternative merits review (the appellate court also denied the claim under *Strickland*, Exh. D at 22-23) revive these claims for federal habeas review. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding"; default should be enforced so long as state court relied on "independent and adequate" state law ground to deny claim) (emphasis in original); *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002) (state court's clear and express invocation of state procedural ground to deny claim results in procedural default, even if court addresses claim on merits in alternative holding). Because the state appellate court disposed of Claim 1 on an independent and adequate state law ground, it is procedurally defaulted.

Similarly, Claims 2 and 3, although raised in petitioner's second postconviction petition, were rejected on an independent and adequate state law ground: petitioner was not granted leave to file the successive postconviction petition in which it was raised. Exh. Y at 35; Exh. J at 4; *see also* 725 ILCS 5/122-1(f). Because the state courts' refusal to review Claims 2 and 3 plainly rested upon the independent and adequate state law ground, namely, section 122-1(f)'s

procedural bar, *see* Exh. J at 4, federal habeas review of those claims in unavailable. *See Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009) (explaining that "when a state refuses to adjudicate a petitioner's federal claims because they were not raised in accord with the state's procedural rules, that will normally qualify as an independent and adequate state ground for denying federal habeas review"); *see also Rios v. Hardy*, No. 09 C 3846, 2013 WL 1103480, at *2 (N.D. Ill. Mar. 15, 2013) (holding that state court's enforcement of Section 122-1(f) barred federal habeas review); *Robinson v. Godinez*, No. 10 C 6948, 2012 WL 1144853, at *6 (N.D. Ill. Apr. 3, 2012) (same); *Johnson v. McCann*, No. 06 C 5352, 2008 WL 4613410, at *1 (N.D. Ill. Oct. 10, 2008) (same).

### 3.    Petitioner cannot excuse these defaults.

A defaulted claim may be reviewed only upon showing (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice. *House*, 547 U.S. at 536; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The fundamental miscarriage of justice exception is limited to the "extremely rare" and "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 321; *see also House*, 547 U.S. at 537.

Petitioner does not argue cause for his defaults, and as explained above, petitioner has failed to show that he is actually innocent. *See supra* 19-21. Thus,

the defaults should be enforced.  *Cf. Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008) (court may consider defaulted claim only if petitioner "can establish cause and prejudice for the default or that the failure to consider the claim would result in a fundamental miscarriage of justice"); *Franklin v. Gilmore*, 188 F.3d 877, 884 (7th Cir. 1999) (same).

### B.    Petitioner's Claims Are Meritless.

#### 1.    Claim 1 is barred by § 2254(d).

##### a.    The § 2254(d) standard.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).  Thus, where the state courts have addressed petitioner's claim on the merits, a federal court must first determine, based solely on the record before the state court, whether the state court's rejection of petitioner's claim was contrary to, or an unreasonable application of, United States Supreme Court precedent.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").  Such review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.* at 1398.  In this way, the statute acts as a "relitigation bar" for claims previously adjudicated on the merits in state court, and clearing that bar by means of any of the listed exceptions in § 2254(d) is "meant to be" a "difficult" undertaking, for

27

federal habeas relief functions only to "guard against extreme malfunctions in the state criminal justice system," *Harrington*, 131 S. Ct. at 785-86, and "not as a means of error correction," *Greene v. Fisher,* 132 S. Ct. 38, 44-45 (2011). Only after this bar is cleared may the district court measure de novo the constitutional claim, and decide whether habeas relief is appropriate under § 2254(a). *Mosley v. Atchison*, 689 F.3d 838, 853 (7th Cir. 2012).

> **b.   The state appellate court's rejection of Claim 1 was neither contrary to, nor an unreasonable application of, United States Supreme Court precedent.**

To show ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness; and (2) but for counsel's alleged errors or omissions, there is a reasonable probability that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. at 668, 688, 694 (1984) (quoting *Strickland*, 466 U.S. at 689). Although there are two prongs to the *Strickland* standard, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. To establish prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In addition, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (citation omitted); *see Harrington*, 131 S. Ct. at 788. Accordingly, review of petitioner's *Strickland* claim is "doubly deferential," *id.*, such that "only a clear error in applying *Strickland* will support a writ of habeas corpus,and to the public," *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009); *see Harrington*, 131 S. Ct. at 788.

The appellate court's decision on direct appeal rejecting Claim 1 was neither contrary to, nor an unreasonable application of, *Strickland*. The appellate court correctly identified the legal standard governing petitioner's *Strickland* claim, explaining that "[f]ailure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim." Exh. D at 18. Accordingly, the state appellate court's decision was not contrary to *Strickland*. *See Price v. Vincent*, 538 U.S. 634, 640 (2003).

The appellate court then reasonably applied the *Strickland* standard to the facts and concluded that his claim that counsel was ineffective for failing to impeach Rodriguez with his prior statement that he had shot the victim was without merit. Exh. D at 20-23. First, the appellate court reviewed petitioner's allegations:

> In this case, [petitioner] claims that "sometime before trial,"
> defense counsel obtained a copy of an affidavit signed by Rodriguez

29

claiming that he shot Arroyo and that [petitioner] was innocent.
[Petitioner] argues that because the prior inconsistent statements of
Rodriguez, Gomez and Cardenas that [petitioner] shot Arroyo
constitute the heart of the State's case against him, trial counsel's
failure to impeach Rodriguez with his affidavit was objectively
unreasonable.

Exh. D at 19. The appellate court then reasonably determined that trial counsel's

decision not to impeach Rodriguez with the affidavit was sound trial strategy:

> Here, [petitioner] has failed to overcome the presumption that
> trial counsel's decision not to confront Rodriguez with his affidavit was
> a matter of sound trial strategy. Rodriguez gave his videotaped
> statement shortly after Arroyo's murder, whereas the affidavit in
> question, dated October 25, 2002, was made over two years later, and
> after he pleaded guilty for his part in the first degree murder of
> Arroyo. Moreover, at trial, Rodriguez testified that [petitioner] was
> not present when he and Stein went to the park to gather other
> members of the Cobras gang in order to go and look for the Royals. He
> also testified that he did not see who shot Arroyo, and that police
> coerced him into implicating [petitioner] as the shooter in his
> videotaped statement. Under these circumstances, counsel could have
> reasonably concluded that confronting Rodriguez with his affidavit
> stating that he shot Arroyo would have cast more doubt on the
> credibility of his in-court testimony, which was beneficial to
> [petitioner's] defense. *See People v. Rogers*, 147 Ill. App. 3d 1, 5-6 [497
> N.E.2d 856, 858-59] (1986) (counsel's decision not to introduce
> witnesses' prior consistent statement was reasonable trial strategy
> where that statement might have damaged the credibility of the
> witnesses' in-court testimony). Accordingly, counsel's decision to focus
> on the coercive circumstances under which Rodriguez gave his
> videotaped statement, and not to confront Rodriguez with his affidavit
> or seek to admit it into evidence, was a matter of sound trial strategy
> that did not fall below an objective standard of reasonableness (*Rogers*,
> 147 Ill. App. 3d at 5-6 [497 N.E.2d at 858-59]) or render the
> proceedings fundamentally unfair.

Exh. D at 21-22.

The state appellate court also reasonably found that petitioner was not

prejudiced by counsel's decision not to impeach Rodriguez with the affidavit:

30

> In this case, Stein gave unrefuted testimony that he saw [petitioner]
> approach the victim's car and reach his arm through its window, and
> then heard two gunshots and saw two flashes of light. According to
> Stein, [petitioner] was the only person near the vehicle at the time.
> Korner testified that, after the collision, Arroyo leaned over her and
> tried to cover her up. The medical examiner testified that Arroyo died
> of a gunshot wound to the back, and that the bullet's trajectory was
> consistent with Arroyo being hunched over someone at the time he was
> shot. Finally, the court stated that it believed the prior statements of
> Cardenas, Gomez, and Rodriguez, all of which implicated [petitioner]
> as the shooter, and that it did not believe their trial testimony. Given
> these credibility determinations, which are the province of the trial
> court (*People v. Ortiz*, 196 Ill. 2d 236, 259 (2001) [752 N.E.2d 410,
> 425]), and the other trial evidence implicating [petitioner] as the
> shooter, we conclude that [petitioner] has not shown that counsel's
> alleged deficient performance rendered his trial unreliable to establish
> the prejudice prong of the *Strickland* test.

Exh. D at 22-23

The state appellate court's rejection of petitioner's claim on the ground that

counsel's performance was not deficient and that, even if is was, petitioner was not

prejudiced, was not "so lacking in justification" that it was erroneous "beyond any

possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786. Counsel

had decided to bolster the credibility of Rodriguez's helpful trial testimony by

challenging the voluntariness of his prior inconsistent videotaped statement.

Rodriguez's credibility would not have been bolstered by impeaching his testimony

with an affidavit that offered a third account that was inconsistent with both the

videotaped statement and Rodriguez's testimony. Moreover, there is no reasonable

basis to believe that the trial judge would have credited the affidavit over the

videotaped statement for the same reason that he did not credit Rodriguez's trial

testimony over the videotaped statement: Rodriguez had a "much stronger motive"

to lie after he had been convicted and sentenced than he did when he gave the videotaped statement, at which point he "got nothing out of implicating [petitioner] as the shooter." Exh. D at 16. Because Rodriguez both signed the affidavit and testified after he was convicted and sentenced, the trial court would have viewed both pieces of evidence with the same incredulity. The state appellate court's resolution of this claim was factually and legally reasonable, barring relitigation here under § 2254(d).

### 2. Claims 2 and 3 are meritless.

Claim 2 (that trial counsel was ineffective for failing to call petitioner's girlfriend, Cassandra Rivera, as an alibi witness) is meritless as well. Again, to prevail, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The addition of petitioner's girlfriend's testimony — that he was at the scene of the crime but did shoot anyone — would not have created a reasonable probability of a different outcome. Her testimony would be contradicted by the prior statements of Cardenas, Gomez, and Rodriguez, all of which the trial court credited. Exh. D at 16. As the trial court explained, "its credibility determination was an 'easy one,'" because "it did not believe the trial testimony of Cardenas, Gomez and Rodriguez," and found that "their prior statements were the truth." *Id*. Cassandra's testimony would not have overcome the credible prior statements of Cardenas, Gomez, and Rodriguez, which the trial court found "fully and consistently

32

detailed the sequence of events the night of Arroyo's murder," and were corroborated by the testimony of the detectives and ASAs. *Id.* Nor would it have overcome the "unrefuted testimony" of Brian Stein that "he saw [petitioner] approach the victim's car and reach his arm through its window, and then heard two gunshots and saw two flashes of light." Exh. D at 22. And, as petitioner's girlfriend, Exh. D at 2, Cassandra's testimony would be still less credible. *See Sumner v. Washington*, 840 F. Supp. 562, 576 (N.D. Ill. 1993) (testimony of petitioner's former girlfriend would have "less impact and credibility than that of a neutral witness").

Claim 3 (that appellate counsel on direct appeal was ineffective for failing to raise trial counsel's failure to interview and call Cassandra Rivera as an alibi witness) is meritless for the same reason: petitioner could not show prejudice because Cassandra's testimony would not create a reasonable probability of a different outcome.

Not only that, petitioner could not show that appellate counsel's performance was deficient. Under *Strickland*, "[f]ailure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) (citing *Strickland*, 466 U.S. at 687). Here, appellate counsel could have decided that Claim 2 was a losing argument for at least two reasons. First, as described above, petitioner would not have been able to show prejudice. Second, the state appellate court would have denied relief on Claim

2 for the same reason as Claim 1: petitioner forfeited both claims by failing to raise them in his postconviction petition. *See* Exh. D at 19-20; Exh. V at C93-94 (Cassandra omitted from post-trial motion list of allegations of trial counsel's ineffectiveness). To the extent that appellate counsel held out hope that the state appellate court would review the merits of Claim 1 — Rodriguez's affidavit was at least mentioned in the post-trial motion, albeit in an allegation that trial counsel should have used it as a prior *consistent* statement, rather than as a prior *inconsistent* statement, as counsel argued on appeal, *see* Exh. V at C93-94; Exh. D at 19-20 — there was no basis to believe that the appellate court would overlook the forfeiture of Claim 2 had it been raised on direct appeal. Cassandra was not mentioned in the post-trial motion at all. *See* Exh. V at 93-94. Therefore, appellate counsel was not ineffective for declining to raise petitioner's meritless and forfeited claim on direct appeal. *Stone*, 86 F.3d at 717 (citing *Strickland*, 466 U.S. at 687).

## VII.  This Court Should Not Grant A Certificate Of Appealability.

"Habeas corpus Rule 11(a) requires district judges to decide whether to grant a [certificate of appealability (CA)] in the first instance." *Gonzalez v. Thaler*, 132 S. Ct. 641, 649 n.5 (2012). To obtain a CA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). If the district court "denies a habeas petition on procedural grounds without reaching the merits of the prisoner's underlying constitutional claim," a CA should issue "when the prisoner shows, at least, that jurists of reason would find it debatable whether

34

the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This Court should decline to certify any issues for appeal because, as demonstrated by respondent, it is not debatable that the petition is untimely. Nor is it debatable that petitioner's claims are procedurally defaulted and meritless.

## CONCLUSION

This Court should deny the petition for a writ of habeas corpus without granting an evidentiary hearing and deny a certificate of appealability.

October 30, 2013

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By:   s/ Joshua M. Schneider
JOSHUA M. SCHNEIDER, Bar # 629755
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
TELEPHONE: (312) 814-3565
FAX: (312) 814-2253
EMAIL: jschneider@atg.state.il.us

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 30, 2013, I electronically filed the foregoing **Answer** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, and on the same date mailed a copy of that document via the United States Postal Service to the following non-CM/ECF user:

    Anthony Hernandez, B77118
    Menard Correctional Center
    P.O. Box 1000
    Menard, Illinois 62259

<u>s/ Joshua M. Schneider</u>
JOSHUA M. SCHNEIDER, Bar # 6297555
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
TELEPHONE: (312) 814-3565
FAX: (312) 814-2253
EMAIL: jschneider@atg.state.il.us